UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
SANTIA ARROYO,                                   :
                                                 :
                    Plaintiff,       :      14-CV-9953 (JPO)
         -v-                             :
                                     :      OPINION AND ORDER
THE CITY OF NEW YORK, *et al.*,                  :
                                                 :
                    Defendants.      :
------------------------------------------------------------ X

J. PAUL OETKEN, District Judge:

      Plaintiff Santia Arroyo filed this action against the City of New York and New York Police Department Officers Michael A. Vega and Wanda Perez (collectively, "Defendants") on December 17, 2014. Arroyo asserts claims under 42 U.S.C. § 1983 and New York law arising from her interactions with Vega and Perez on December 20, 2011, her subsequent detention for mental health treatment, and her arrest for possession of a firearm. The parties have filed cross-motions for summary judgment. (Dkt. Nos. 26, 31.) For the reasons that follow, Defendants' motion is granted and Arroyo's motion is denied.

I.     Background

      On December 20, 2011, Officers Vega and Perez ("the Officers") received a radio call reporting possible elder abuse at Arroyo's home address. (Dkt. No. 36 ¶ 5.) According to Defendants, the caller who made the report was an employee from a visiting nurse service, who stated that the daughter in the household was bipolar and kept a sword under her mattress. (*Id.* ¶¶ 5-8, 44; *see also* Dkt. No. 38-2.) Officers Vega and Perez proceeded to Arroyo's address, where they encountered a closed door. (Dkt. No. 36 ¶¶ 16-17.) The parties dispute whether the door was locked and whether the officers knocked. (Dkt. No. 34-4 at 67; Dkt. No. 36 ¶¶ 20-23.) They agree that, at some point, the Officers entered the home by turning the doorknob. (Dkt. No. 34-4 at 67; Dkt. No. 36 ¶¶ 20-23.)

Inside the home, the Officers found Arroyo, who is paraplegic, sitting in a wheelchair in the dark. (Dkt. No. 36. ¶¶ 26-29.) When Arroyo was initially non-responsive to the Officers' questions, they "conducted a protective sweep" of the apartment and found Arroyo's mother in a bedroom. (*Id.* ¶¶ 32-39.) According to Defendants, Officer Perez asked Arroyo's mother why she did not come to the door and "the mother responded that her daughter does not let her answer the door and that she is only allowed to go to the bathroom." (*Id.* ¶¶ 39-40.) Arroyo does not dispute that her mother made these statements, but she objects to them as hearsay and avers that her mother has been "all over the house." (*Id.* ¶ 40.)

After speaking with Arroyo's mother, the Officers stayed in the apartment for at least two hours. (*Id.* ¶¶ 32, 58, 70-74, 117.) During that time, Arroyo did not communicate verbally, and was, as she describes it, physically sick and "out of it." (*Id.* ¶¶ 52-63, 66.) Arroyo testified at her deposition that she experiences seizures, and that on December 20, 2011, she had high blood pressure and likely had a migraine. (*Id.* ¶¶ 60-63.) She also states that her vision was blurry and that she became aware only "after the fact" that the people in her apartment were police officers. (*Id.* ¶ 69.)

While in the apartment, Officer Perez "obtained the [contact] information for [Arroyo's mother's] home attendant [from] the Visiting Nurse Service." (*Id.* ¶ 43.) Officer Perez then called the home attendant, who stated that "she was afraid to go to [Arroyo's] apartment," that she was "afraid of [Arroyo]," who "yells and screams at her mother," and that she had "overhead a conversation about a gun in the apartment." (*Id.* ¶¶ 45-49.) Arroyo does not dispute that the home attendant made these statements, but she objects to them as hearsay. (*Id.*)

According to Defendants, after Officer Perez spoke to the home attendant, she relayed her conversation to Officer Vega, who "tried to speak to [Arroyo] again." (*Id.* ¶ 55.) Defendants aver that Arroyo remained unresponsive. (*Id.*) Specifically, they assert that Arroyo did not

2

answer "questions including: Are you okay? What's going on? Can you talk to me? Why aren't you speaking? Who is the lady in the bedroom to you?" (*Id.* ¶ 53.) Arroyo agrees that she did not speak to the Officers, but states that she gestured for them to leave. (*Id.* ¶¶ 32, 55-56.)

After trying to speak with Arroyo, the Officers decided to call an ambulance. (*Id.* ¶¶ 32, 58, 70-74.) Before the ambulance arrived, Arroyo "asked the defendant-officers to leave her apartment by motioning with her hands." (*Id.* ¶ 32.) Defendants state that, despite Arroyo's hand motion, they called for emergency medical services because Arroyo had not answered repeated questions about whether "she was okay," had been generally unresponsive, and did not motion for them to leave until after they had been in the apartment for "over an hour and a half." (*Id.* ¶¶ 32-33, 52-58.) When they arrived, the emergency medical personnel took Arroyo to Metropolitan Hospital. (*Id.* ¶ 88.)

Officers Perez and Vega remained in the apartment after Arroyo went to the hospital. (*Id.* ¶¶ 120-23.) Before he left, Officer Vega looked inside Arroyo's purse and found a gun. (*Id.*) According to Defendants, Vega opened the purse to look for keys so that the Officers could lock the apartment. (*Id.*) Defendants contend that Arroyo's mother told them that Arroyo kept her keys in her purse. (*Id.* ¶ 120; Dkt. No. 34-2 at 23.) Arroyo, in contrast, avers that her keys were "in plain view" on her bed. (Dkt. No. 36 ¶ 119.)

Arroyo appears to contest that a gun was found in her purse. (*Id.* ¶ 122 ("It is a disputed fact as to whether any gun was found in Plaintiff's purse . . . .").) She does not, however, support this assertion with sworn testimony that, to her knowledge, there was no gun in her purse. Instead, Arroyo avers that she does not own a gun and cites a statement from Officer Perez, who testified that she did not "see the gun that was found by Officer Vega," but was told by Officer Vega "that he found a gun." (*Id.*; Dkt. No. 34-16 at 18-19.) Arroyo admits that,

3

following a later criminal hearing, "the Criminal Court suppressed the gun." (Dkt. No. 36 ¶ 127.)

When she arrived at Metropolitan Hospital, Arroyo was handcuffed to a bed by "an officer." (*Id.* ¶¶ 90-92.) Arroyo's handcuffs were then removed and she was transferred to Elmhurst Hospital for "a forensic admission." (*Id.* ¶ 95-98.) According to records from Elmhurst Hospital dated December 21, 2011, Arroyo "was brought in by NYPD due to possible mental illness." (Dkt. No. 29-3 at 5.) The records also state that Arroyo "has been observed hearing voices and increasingly paranoid, as per sister," and that she "was guarded and irritable during [her] interview." (*Id.*) Elmhurst Hospital records from six days later state that, at the time of her discharge, Arroyo's "physical condition [was] not consistent with historical information provided by the family," and that "there was no evidence of psychosis while on the unit." (Dkt. No. 34-6 at 1.)

Arroyo was discharged from Elmhurst Hospital on December 27, 2011. She was arraigned in New York Criminal Court the same day on a charge of Criminal Possession of a Weapon in the Fourth Degree. (Dkt. No. 29-5 at 2; Dkt. No. 34-16 at 17; Dkt. No. 36 ¶¶ 116-25, 128; Dkt. No. 38-3 at 30; Dkt. No. 39 at 9.) Arroyo was released on her own recognizance. After an evidentiary hearing in January 2014, the criminal court suppressed the gun on the ground that the Officers had unlawfully entered the apartment. (Dkt. No. 34-2 at 70; Dkt. No. 36 ¶ 127.) The prosecution did not proceed. (Dkt. No. 36 ¶¶ 127-28.)

Arroyo filed suit in this Court on December 17, 2014. (Dkt. No. 1.) In her Complaint, Arroyo asserts claims for false arrest, malicious prosecution, excessive force, and violations of New York state law. (*Id.*) Arroyo also asserts municipal liability claims against the City of New York. (Dkt. No. 1-1 at ¶¶ 28-30.) On November 30, 2015, Defendants moved for summary judgment on all of Arroyo's claims except her "false arrest [claim] based on gun possession."

4

(Dkt. No. 43 at 3; *see also* Dkt. No. 40.)  Arroyo then filed a motion for partial summary judgment seeking a determination that the Officers had "no probable cause to arrest [her] for gun possession."  (Dkt. No. 33 at 5; *see also* Dkt. No. 34 at 3.)

## II.     Discussion

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56.  A fact is material if it "might affect the outcome of the suit under the governing law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute is genuine if, considering the record as a whole, a rational jury could find in favor of the non-moving party.  *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)).  In assessing a motion for summary judgment, the court views the evidence "in the light most favorable to the non-moving party and draw[s] all reasonable inferences in its favor."  *Allen v. Coughlin*, 64 F.3d 77, 79 (2d Cir. 1995) (citation omitted).

### A.     False Arrest

The existence of probable cause is a complete defense to an action for false arrest brought under Section 1983.  *Ackerson v. City of White Plains*, 702 F.3d 15, 19 (2d Cir. 2012); *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996).  Even if a police officer did not have probable cause for an arrest, moreover, he "is shielded by qualified immunity in a false arrest case if *arguable probable cause* existed."  *Smith v. Cty. of Nassau*, No. 15-1251-CV, 2016 WL 1040150, at *1 (2d Cir. Mar. 16, 2016) (per curiam) (emphasis added).  "Arguable probable cause exists when 'a reasonable police officer in the same circumstances and possessing the same knowledge as the officer in question *could* have reasonably believed that probable cause existed in light of well established law.'"  *Cerrone v. Brown*, 246 F.3d 194, 202-03 (2d Cir. 2001) (quoting *Lee v. Sandberg*, 136 F.3d 94, 102 (2d Cir. 1997)); *see Smith*, 2016 WL 1040150, at *1; *Escalera v.*

*Lunn,* 361 F.3d 737, 743 (2d Cir. 2004) ("Arguable probable cause exists 'if either (a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met.'" (quoting *Golino v. City of New Haven*, 950 F.2d 864, 870 (2d Cir. 1991))).

Arroyo asserts two false arrest claims: one based on the Officers' decision to seize and "remove [her] to the Metropolitan Hospital"; and one based on her arrest at "Metropolitan Hospital for allegedly possessing a gun." (Dkt. No. 34 at 3.) Defendants contend that the arrest at Arroyo's home was lawful because "there was probable cause to seize [her] pursuant to New York State's Mental Health and Hygiene Law" ("MHL"). (Dkt. No. 30 at 19.) They defend the second arrest on the ground that discovery of the gun in Arroyo's purse gave them probable cause to arrest her for criminal possession of a weapon. (Dkt. No. 39 at 9.)

  1. **Arrest in Arroyo's Apartment**

The Court begins with the arrest in Arroyo's home. Under MHL § 9.41, a police officer "may take into custody [and remove to a hospital] any person who appears to be mentally ill and is conducting . . . herself in a manner which is likely to result in serious harm to the person or others." N.Y. Mental Hyg. Law § 9.41. In assessing whether an officer had probable cause to arrest a person under this statute, courts apply the same objective reasonableness standard that governs Fourth Amendment claims. *Dunkelberger v. Dunkelberger*, No. 14-CV-3877, 2015 WL 5730605, at *11 (S.D.N.Y. Sept. 30, 2015) (quoting *Kerman v. City of New York*, 261 F.3d 229, 240 n.8 (2d Cir. 2001)). Thus, in cases involving arrests under MHL § 9.41, probable cause exists where "the facts and circumstances known to the officers at the time [of the arrest] were sufficient to warrant a person of reasonable caution to believe that [the plaintiff] might be mentally ill and [was] conducting [herself] in a manner likely to result in serious harm to [herself or others]." *Id.* at *12 (citation and alterations omitted).

It is undisputed that Officers Vega and Perez received a report of elder abuse at Arroyo's address and, when they entered the home, encountered Arroyo in the dark and her mother in another room. The parties also agree that Arroyo was "out of it" and verbally non-responsive for more than hour (Dkt. No. 36 at ¶ 63), that her mother told police that she was not allowed to answer the door (*id.* ¶ 40), and that a home health attendant told the Officers that she was afraid of Arroyo and had heard that Arroyo kept a gun in the apartment (*id.* ¶¶ 47-49). While Arroyo objects to these statements as hearsay, Defendants do not offer them for their truth, but rather, to demonstrate that the statements were made to the Officers as they were assessing the situation in Arroyo's home. Fed. R. Civ. P. 801(c)(2); *see Tuccio v. Papstein*, 307 F. App'x 545, 546 (2d Cir. 2009) ("[T]he challenged paragraphs are not hearsay because defendant is not offering them for the truth of the matters asserted. The statements are instead offered to show the information he had when he applied for the arrest warrant."); *cf. Barnes v. City of New York*, No. 13-CV-7283, 2015 WL 4076007, at *11 (S.D.N.Y. July 2, 2015) ("[P]robable cause may be founded upon hearsay and upon information received from informants, as well as upon information within the affiant's own knowledge that sometimes must be garnered hastily." (quoting *Franks v. Delaware*, 483 U.S. 154, 165 (1978))), *adopted in full*, 2015 WL 5052508 (S.D.N.Y. Aug. 26, 2015).

Courts in this Circuit have determined that probable cause existed where police had slightly more information prior to making an arrest. *See Dunkelberger*, 2015 WL 5730605, at *13 (collecting cases). In *Glowczenski v. Taser International Inc.*, No. 04-CV-4052, 2010 WL 1936200, at *6 (E.D.N.Y. May 13, 2010), for example, the court determined that officers had probable cause to make an MHL § 9.41 arrest where they received 911 calls from the plaintiff's mother, who reported that her son was having a psychotic episode and was a danger to himself. The court concluded that the 911 calls, in addition to the officers' knowledge that the plaintiff

7

had "a long history of mental illness," justified the arrest, despite the fact that the parties disputed whether plaintiff exhibited any signs of violence before the police seized him. *Id.*; *see also Mittelman v. County of Rockland*, No. 07-CV-6382, 2013 WL 1248623, at *1, 12 (S.D.N.Y. 2013) (concluding that probable cause for an MHL § 9.41 arrest existed where defendant "fail[ed] to respond or come out of [his] house" and officers had received information that "the suspect possessed weapons, was in an unstable condition, and had made prior threats . . . ."). In contrast, where police had significantly less, wholly unreliable, or anonymous information, courts have determined that there was no probable cause to arrest. *See Dunkelberger*, 2015 WL 5730605, at *13 (summarizing relevant case law); *see also Myers v. Patterson*, 819 F.3d 625, 633-36 (2d Cir. 2016); *Kerman*, 261 F.3d at 236.

Here, because Defendants need only arguable probable cause to be entitled to qualified immunity, the question is not whether the Officers had probable cause to arrest Arroyo under MHL § 9.41. The question, instead, is whether a reasonable officer could have believed that there was probable cause. *Escalera*, 361 F.3d at 743; *Cerrone*, 246 F.3d at 202-03. In this case, the Officers had information from an identified source with personal knowledge of Arroyo's conduct. That source indicated that Arroyo was threatening to her mother and kept a gun in the home. The Officers also received a 911 call from an identified caller who reported elder abuse and stated that the daughter (Arroyo) was bipolar, observed Arroyo acting in an erratic and unresponsive manner for more than an hour, and spoke with Arroyo's mother, who expressed that she was not permitted to leave her room. Together, these circumstances made it reasonable for an officer to believe that probable cause for an MHL § 9.41 arrest existed. *Cerrone*, 246 F.3d at 202-03; *see also Barnes*, 2015 WL 4076007, at *9 (quoting *Zalaski v. City of Hartford*, 723 F.3d 382, 389 (2d Cir. 2013)). Defendants are therefore entitled to qualified immunity on Arroyo's first false arrest claim.

2.      **Arrest for Gun Possession**

Arroyo's second claim concerns her arrest at the hospital for criminal possession of a firearm.  Probable cause to arrest a person for a suspected criminal violation "exists when the officers have knowledge of, or reasonably trustworthy information as to, facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that an offense has been or is being committed by the person to be arrested."  *Zellner v. Summerlin*, 494 F.3d 344, 368-69 (2d Cir. 2007) (collecting cases).  The offense at issue here is possession of a firearm, which is banned by New York Penal Law § 265.01 ("Section 265.01").

Arroyo argues that Defendants lacked probable cause to arrest her for firearm possession because a New York court later suppressed the gun found in her purse.[1]  (*See* Dkt. No. 33 at 5; Dkt. No. 34-2 at 70.)  While it is true that the gun was suppressed, "the fruit of the poisonous tree doctrine is inapplicable to civil actions arising under § 1983, and courts need not ignore evidence recovered as the result of an unlawful search when evaluating claims for damages."[2]  *Allen v. Antal*, No. 12-CV-8024, 2014 WL 2526977, at *18 (S.D.N.Y. 2014) (citation omitted); *see also Gannon v. City of New York*, 917 F. Supp. 2d 241, 243 (S.D.N.Y. 2013) (citing *Townes v. City of New York*, 176 F.3d 138 (2d Cir. 1999)) ("[T]he Second Circuit has clearly rejected . . . attempt[s] to recover damages under § 1983 based on the fruits of the poisonous tree doctrine.").

Under Second Circuit precedent, the suppression of the gun does not itself preclude a determination that there was arguable probable cause for Arroyo's arrest.  *Id.*  And it is beyond

---

[1] For reasons already stated, there is no genuine dispute as to whether Officer Vega found a gun in Arroyo's purse.  While Arroyo makes the generalized assertion that she does not own a gun, she does not offer any evidence to contest that Officer Vega found a gun in her purse, and she admits that "the Criminal Court suppressed the gun."  (Dkt. No. 36 ¶ 127.)

[2] Insofar as she invokes the criminal court's determination that entry into her apartment was unlawful in order to contest the existence of probable cause for an arrest under MHL § 9.41, this holding applies with equal force to Arroyo's first false arrest claim.

genuine dispute that arguable probable cause existed here. At the time that Arroyo was arrested, police had heard from a home attendant that Arroyo had a gun and had discovered a gun in her purse. The parties do not dispute that Section 265.01 bans possession of the firearm in question, and Arroyo does not contest that the purse belonged to her. In light of these undisputed facts, Defendants are entitled to qualified immunity on Arroyo's second false arrest claim.

### B. Malicious Prosecution

Arroyo also asserts a Section 1983 malicious prosecution claim based on her arrest and subsequent prosecution for criminal possession of a weapon. As with false arrest claims, "the existence of probable cause is a complete defense to a claim of malicious prosecution . . . ," *Manganiello v. City of New York*, 612 F.3d 149, 161-02 (2d Cir. 2010) (citation omitted), and qualified immunity applies where there was arguable probable cause, *Costello v. Milano*, 20 F. Supp. 3d 406, 416 (S.D.N.Y. 2014) (citing *Jean v. Montina*, 412 F. App'x 352, 354 (2d Cir. 2011)). The Court's conclusion that there was arguable probable cause to arrest Arroyo for gun possession thus defeats her malicious prosecution claim as well.[3]

### C. Excessive Force

Arroyo next asserts an excessive force claim based on her arrest and handcuffing at Metropolitan Hospital. (*See* Dkt. No. 34 at 17.) "A section 1983 excessive force claim arising in the context of an arrest is analyzed under Fourth Amendment principles." *Higginbotham v. City of New York*, 105 F. Supp. 3d 369, 376 (S.D.N.Y. 2015) (citing *Graham v. Connor*, 490 U.S. 386, 394 (1989)). To prevail on an excessive force claim, "the plaintiff must show that the defendants' use of force was objectively unreasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id.* (citation omitted).

---

[3] In light of this conclusion, the Court need not and does not address Defendants' other arguments for summary judgment on Arroyo's malicious prosecution claim.

In analyzing excessive force claims involving the use of handcuffs, courts consider "(1) whether the handcuffs were unreasonably tight[;] (2) whether the defendants ignored the plaintiff's pleas that the handcuffs were too tight; and (3) the degree of injury to the wrists." *Id.* at 377 (quoting *Lynch ex rel. Lynch v. City of Mount Vernon*, 567 F. Supp. 2d 459, 468-69 (S.D.N.Y. 2008) (internal quotation marks and alterations omitted)); *see also Usavage v. Port Auth. of N.Y. and N.J.*, 932 F. Supp. 2d 575, 594-96 (S.D.N.Y. 2013). As a general rule, "tight handcuffing does not constitute excessive force unless it causes injuries beyond pain and bruising." *Higginbotham*, 105 F. Supp. 3d at 377 (collecting cases); *see Usavage*, 932 F. Supp. 2d at 596 (noting that, while the injury from the handcuffs need not be "severe or permanent," it "must transcend temporary discomfort") (citation and alterations omitted).

The parties dispute whether a named Defendant or another officer placed the handcuffs on Arroyo at Metropolitan Hospital. (*See* Dkt. No. 34 at 17.) The Court need not resolve this dispute because, even if a named Defendant handcuffed Arroyo, there is no genuine dispute of material fact as to whether her handcuffing involved excessive force.[4] Arroyo has not averred that the handcuffs were too tight; that she suffered any physical injury; or that she asked for the handcuffs to be removed. To the contrary, at her deposition, Arroyo testified that she did not ask why she was being handcuffed and did not speak to anyone concerning the handcuffs. (*See* Dkt. No. 34-4 ("Q: [D]id you ask the officer why you were being handcuffed at that time? A: I didn't speak to nobody.").)

---

[4] In a separate letter motion, Arroyo seeks to submit additional evidence to support her assertion that Officer Vega was present at Metropolitan Hospital. (Dkt. Nos. 46.) Defendants oppose this motion. (Dkt. No. 47.) Because the Court concludes that summary judgment is warranted even if Officer Vega placed the handcuffs on Arroyo, the request to submit additional evidence is denied as moot.

Arroyo does assert that being handcuffed caused her stress and that her experience at Metropolitan Hospital contributed to post-traumatic stress.[5] (Dkt. No. 34 at 17; *see also* Dkt. No. 34-11 at 6.) Given the totality of the undisputed evidence, however, this assertion alone does not create a genuine dispute of material fact as to whether Arroyo was subjected to excessive force. *See Lynch*, 567 F. Supp. 2d 459, 468-69 (granting summary judgment on a handcuffing claim); *Stokes v. City of New York*, No. 05-CV-0007, 2007 WL 1300983, at *12 (E.D.N.Y. May 3, 2007) ("[Plaintiff] makes no claim that the handcuffs were too tight, that she made any complaints of discomfort to defendants, or that she suffered any physical injury as a result of the handcuffing. Under such circumstances, this Court concludes, as a matter of law, that the handcuffing of [plaintiff] cannot constitute excessive force."). The Court therefore grants summary judgment to Defendants on Arroyo's excessive force claim.

### D.     Municipal Liability

Arroyo also asserts claims against the City of New York under *Monell v. Department of Social Services of the City of New York,* 436 U.S. 658, 691 (1978). *Monell* permits Section 1983 suits against municipalities "when the alleged unlawful action implemented or was executed pursuant to a governmental policy or custom." *Reynolds v. Guiliani*, 506 F. 3d 183, 190 (2d Cir. 2007) (citation omitted). To succeed on a *Monell* claim, a plaintiff "must first prove the existence of a municipal policy or custom . . . ." *Plair v. City of New York*, 789 F. Supp. 2d 459, 468 (S.D.N.Y. 2011) (citing *Vippolis v. Village of Haverstraw*, 768 F.3d 40, 44 (2d Cir. 1985)). If the plaintiff can show the existence of a policy or custom, he must then "establish a [causal]

---

[5] While Defendants' brief anticipates an argument concerning the reasonableness of handcuffing Arroyo given her physical condition, Arroyo does not raise that argument in her opposition brief or her motion for partial summary judgment. (Dkt. Nos. 33, 34 at 17.) The Court declines to address an argument Arroyo has not made.

connection—an affirmative link—between the policy and deprivation of his constitutional rights." *Id.* (citation and alteration omitted).

Arroyo alleges that she was injured by city policies or customs of "entering private residences without conducting any investigation," "removing individuals from their home[s]" without probable cause, and "handcuffing individuals who are paraplegics even when such individuals are not violent." (Dkt. No. 1-1 at ¶¶ 28-30.) To support these assertions, Arroyo cites: (1) a statement by a prosecutor in the criminal proceeding against her, who said that elder abuse constitutes an emergency; (2) a statement from Officer Vega, who testified that, given the 911 call reporting elder abuse, he would have removed Arroyo's mother even if Arroyo had stated that she was fine; (3) Officer Perez's testimony that she relies on her "experience of twenty years on the job or more" to determine how best to "deal[] with people with mental illness"; (4) a June 2008 report by the New York State/New York City Mental Health Criminal Justice Panel, which endorsed police training for dealing with "emotionally disturbed people"; and (5) Officer Perez's statement that it can be proper to handcuff a nonviolent individual for "safety purposes" or so that he does not escape.[6] (Dkt. No. 34 at 16; *see also* Dkt. No. 34-13; Dkt. No. 34-16 at 11.)

Even when all inferences are construed in Arroyo's favor, reference to these sources does not give rise to a genuine dispute of material fact on her *Monell* claims. Aside from a six-year-old report from a criminal justice panel, Arroyo cites only statements concerning the single incident in question. *See Davis v. City of New York*, 228 F. Supp. 2d 327, 346 n.35 (S.D.N.Y. 2002) ("As a matter of law, one incident of unconstitutional conduct by a city employee cannot

---

[6] Defendants object to Arroyo's submission of the June 2008 report (Dkt. No. 34-13), and another exhibit (Dkt. No. 34-15), on the ground that neither document was produced during discovery (Dkt. No. 43 at 1). In light of the Court's determination that summary judgment would be warranted even if the exhibits had been properly produced, the request to strike those documents under Federal Rule of Civil Procedure 37 is denied as moot.

be a basis for finding an agency-wide custom."). Arroyo has not offered evidence of a citywide policy, nor has she linked such a policy to her treatment. Accordingly, the Court grants the motion for summary judgment on Arroyo's *Monell* claims.

### E. State Law Claims

All of Arroyo's remaining claims arise under state law. Specifically, she asserts claims for intentional and negligent infliction of emotional distress; negligent hiring, supervision, and training; false arrest and imprisonment; assault and battery; and negligence.[7] Because it has dismissed all of Arroyo's federal claims, the Court declines to exercise supplemental jurisdiction over these state-law claims. *See Oneida Indian Nation of New York v. Madison Cty.*, 665 F. 3d 408, 436-37 (2d Cir. 2011) ("Although federal courts may exercise jurisdiction over related state-law claims . . . a court may . . . nonetheless decline to exercise supplemental jurisdiction over a claim [where] . . . the district court has dismissed all claims over which it has original jurisdiction." (citation and internal quotation marks omitted)); *Valencia ex rel. Franco v. Lee*, 316 F. 3d 299, 305 (2d Cir. 2003) ("[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims." (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988))). Having considered each of the relevant factors, the Court

---

[7] The Complaint asserts emotional distress claims under both New York tort law and Section 1983, but Arroyo's counsel cites no case law to support the latter theory of liability. The opposition brief does cite one 1979 case from the Seventh Circuit in support of the argument that "intentional infliction of emotional distress . . . may breach the Due Process Clause." (Dkt. No. 34 at 20 (citing *White v. Rochford*, 592 F.2d 381 (7th Cir. 1979).) But the Complaint does not assert a Due Process claim. As pleaded, Arroyo's emotional distress claims arise under state law. *See Plair*, 789 F. Supp. 2d at 467 (treating intentional and negligent infliction of emotion distress claims as state-law tort claims in an excessive force case); *Lynch*, 567 F. Supp. 2d at 470 (same).

concludes that it is appropriate to decline supplemental jurisdiction over the state-law claims in this case.

### III. Conclusion

For the foregoing reasons, Defendants' motion for summary judgment is GRANTED, Arroyo's motion for partial summary judgment is DENIED, and the Court declines to exercise supplemental jurisdiction over the remaining state-law claims.

The Clerk of Court is directed to close the motions at docket numbers 26, 31, and 46 and to close this case.

SO ORDERED.

Dated: July 8, 2016
New York, New York

_____
J. PAUL OETKEN
United States District Judge